Q. How many magazines did they find?
A. One in the gun and three individually. All loaded.
Q. How does Government Exhibit 32 compare with the 9-millimeter weapon the Police seized on August 2, 1994 from inside the vehicle around the area where you were living?
A. It's the same.
Q. Was that the weapon that was seized from you?
A. Yes, that was the weapon that was seized from me.
Q. Do you recall who was the officer who intervened directly with you?
A. Well, officer Yamil and another officer whose name I don't recall.

THE COURT:

Let's provide an explanation. We have asked the ladies and gentlemen of the jury for a big sacrifice; and well, we need to ask you for more: we expect the air conditioning unit to be working well again tomorrow. Go ahead.

BY THE PROSECUTOR:

Q. What did the Police physically to with you, Regino?
A. Well, just, when I got out of the vehicle, they handcuffed me and they put me inside a car; my wife was also handcuffed and they put her in a separate vehicle. And they took the van, and then I was also taken over to the Carolina Station.
Q. Tell the ladies and gentlemen of the jury: Were you informed of the reason why the Police was looking for you and intervened with you that early morning?
A. Not at that time, when they put the handcuffs on me and arrested me. They told me inside the vehicle that was parked right there.
Q. What did they inform you of?
A. That I was wanted for some murder charges in the Piñones area. And that I



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

was a suspect.

Q. Is that regarding the events you have testified about and admitted to the ladies and gentlemen of the jury?

A. For the same events I have narrated today.

Q. Tell the ladies and gentlemen of the jury: Have you been charged with the four deaths that you have narrated to them which occurred in the early morning of July 4, 1994?

A. Yes, I was charged.

Q. What physically happened with you when the Police arrested you in the early morning of August 2? What did they do with you?

A. No, just... like I said, they arrested me and took me to the station. I mean, there was no struggle nor any assault.

Q. Right. And after the Police carried out the process, what did they do?

A. Well, uh, I stayed; they left me in the cell at the station while they waited to transfer me to Court so that they could make the charges formal before the Judge.

Q. And were the charges against you formalized?

A. Yes.

Q. Do you recall whether you were assigned bail for these charges?

A. Yes.

Q. More or less, how much did they give you, if you recall?

A. Like, I don't recall very well. About 250,000. I don't recall.

Q. Tell the ladies and gentlemen of the jury: Did you have the money and post that bail that was imposed?

A. No, I did not have the money nor did I post bail.

Q. All right. Are we to understand that you were incarcerated; you were sent to a Penal Institution?

A. Yes.

Q. Which specific prison were you sent to?

A. I was sent to 292 in Bayamón, which is a maximum-security prison.

Q. All right. Regino, tell the ladies and gentlemen of the jury in what way, what is the process through which, once you were incarcerated, you became a witness for the Government in these cases?

A. Well, while I was incarcerated, once again, I thought about my daughter, my family and my wife, and the... and the alleged friends I had on the street, who had done nothing. It had been two months, and they had not done anything for me.

Q. And after that analysis, what did you do?

A. Well, I decided to cooperate, because since I did not expect anything else, because they were not going to bail me out, nor did I have an attorney I could afford, I had legal aid, well, nobody wanted to help me; so I decided to cooperate.

Q. Who were the alleged friends you had who did nothing to help you while you were imprisoned?

A. Crespo, Crespo Morales, Rey, Miguel and Ronald.

Q. Regino, tell the ladies and gentlemen of the jury: Have you ever in your life lived outside of Puerto Rico?

A. Whether I've lived there?

Q. Yes.

A. I lived outside of Puerto Rico for two months, in the States.

Q. More or less how old were you, Regino, when you lived in the States?

A. Eighteen years old.

Q. Tell the ladies and gentlemen of the jury: Did you face any legal



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

problems in the States at that time?

A. Yes, I faced a legal problem in the States, related to drugs.

Q. What? What were you charged with, Regino?

A. A drug sale.

Q. How much?

A. Well, the sale was like some capsules, but of cocaine, to an agent.

Q. Right. How much was the capsule worth?

A. 5.00 dollars.

Q. What happened with that case?

A. Well, when I made the sale and I was arrested and taken to court, because they did not find any marked bills the agent had given me, then they decided to set me free, but with a summons to come back.

Q. And did you go back to the process?

A. No.

Q. What did you do, Regino?

A. I came to Puerto Rico.

Q. Tell the ladies and gentlemen of the jury: Did you have any kind of notice related to what had happened with that proceeding you had left in the States?

A. No, I did not; I have not had any notice related to that case, until I was arrested over here for that case.

Q. When were you arrested, more or less, Regino?

A. Back in '93.

Q What happened? Why were you arrested over here; were you arrested in Puerto Rico?

A. Yes.

Q. And what happened with the case?



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

A. I was arrested here in Puerto Rico, and I was released after spending ten days in prison, because the judge believed that the case had already expired.

Q. Which judge? The judge in Puerto Rico...

A. No.

Q. ... or the one who had the case in the States?

A. In the States.

Q. Were you enjoying any kind of benefit at the time of the events you have narrated for the ladies and gentlemen of the jury?

A. Enjoying any kind of benefit?

Q. Yes. Were you on probation, or were you released...?

A. Yes, on probation.

Q. You were on probation?

A. Yes.

Q. What were you on probation for, Regino?

A. For a case in Puerto Rico, in Humacao, related to weapons law, car theft and robbery.

Q. What sentence were you serving on probation, Regino?

A. A ten-year sentence, as far as I understand.

Q. Tell the ladies and gentlemen of the jury if you have any agreement with the Department of Justice in order for you to testify in this case.

A. Yes. Yes.

Q. And what does that agreement with the Department of Justice consist of?

A. Well... while...

Q. I mean, your participation in the case; are you not going to do any time



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

whatsoever?

A. No, yes; I am going to serve my term. Yes, I will do prison time.

Q. All right. That is, with regard to the cases in which you participated, what are you going to do? The events about which you have told the ladies and gentlemen of the jury.

A. Thirty years. My sentence is 30 years.

Q. In other words, you are going to plead guilty to the charges?

A. Yes.

Q. What is going to happen with the probation you were enjoying from the Humacao Superior Division?

A. Revocation. It will be revoked.

Q. In addition to the events you have narrated for the ladies and gentlemen of the jury, state whether there is any other crime you have committed included in the agreement you have with the Department of Justice.

A. Yes. I have a legal case in the Court of San Juan.

Q. What is that case about, Regino?

A. Murder.

Q. In that specific case in San Juan, do you recall who was the individual whose life you took?

A. Hiram Cantre.

Q. In the number you stated, the seven individuals you have killed as part of the relationship you had with Cristóbal, was that individual included in that group?

A. Yes.

Q. Can you tell the ladies and gentlemen of the jury why that death took place, Hiram Cantre's death?

A. María del Mar Dávila.

Q. And for whom does María del Mar Dávila's partner work?

A. For the same Court, for Legal Aid.

Q. You spoke with her; and what happened?

A. Well, I spoke with her, and she told me she was going to talk to someone to see. And later, during that process, she told me that they could come to something. And that's when they started, I started speaking with the authorities about what happened and how it happened.

Q. With regard to the other terms of time you will serve in jail for everything that you have narrated, was that put in writing?

A. Yes.

Q. Yes?

A. Yes.

Q. How do you know it was put in writing?

A. Because I read it and signed it.

Q. Um-hmm.

A. First the prosecutor read it to me, I read it, and then I signed it.

MR. FARINACCI:

I have no objection to it being given an identification number.

THE COURT:

Very well. Identify it.

COURT CLERK:

People's Identification 4.

BY THE PROSECUTOR:

Q. Regino, I am going to show you what has been marked as Government's Identification Number 4, for you to examine it and tell the ladies and gentlemen of



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

the jury if you recognize this Identification Number 4.

A. Yes.

Q. What is Identification Number 4?

A. It is the agreement reached with the prosecutors, the one the prosecutor read to me, which I read and signed.

Q. How do you know that is the one you read and signed?

A. Because I read it in its entirety.

Q. You said you signed it?

A. That too.

Q. Where is your signature in that identification?

A. There is "RBT" in every page, and my full signature is on the last page.

Q. Where is your full signature?

A. Here.

Q. All right. Regino, tell the ladies and gentlemen of the jury: Do you have any tattoos on your hand, your left hand?

A. On my hand?

Q. Yes. Your left hand; do you have a tattoo?

A. No, not on my hand.

Q. On your hand? It's not on your hand?

A. No.

MR. FARINACCI:

Have him show us.

BY THE PROSECUTOR:

Q. You have some sort of tattoo on your extremities. I am solely talking



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

about your extremities. The area from your shoulder downward.

A. Yes, Regino.

Q. Where, Regino?

A. On my right hand and my left hand.

MR. FARINACCI:

Is it on your arm?

A. Yes, on my arm.

BY THE PROSECUTOR:

Q. What area of your body...?

A. On my arm.

Q. Okay. And the other one.

MR. FARINACCI:

I would like for him to show the ladies and gentlemen of the jury more closely.

PROSECUTOR:

Your Honor, we believe that it...

THE COURT:

All right. ...UNINTELLIGIBLE...

BY THE PROSECUTOR:

Q. Regino, can you tell the ladies and gentlemen of the jury why, given your life history as we indicated, you decided to get those tattoos?

A. Yes, because when I was in prison, well, you know, my morale was very low, and I was serving a ten-year sentence when I was in prison, so I decided to get the tattoos.

Q. In other words, are the ladies and gentlemen of the jury to understand that you got those tattoos while you were incarcerated?



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.