Yes, but I have to say it for the record.

THE COURT:

Go ahead.

MR. FARINACCI:

We were told the same, that it was because they could not come in for the trial. We would like to note that for the record, very respectfully, because we believe that our client calls for his constitutional right to a public trial, although we are aware that the Court has the right and the duty to guarantee safety and a safe environment in the courthouse. But we believe these measures have affected his constitutional right to a public trial. And that is our statement.

THE COURT:

All right. The order in this Court is that whoever wishes to come inside a courtroom will be allowed to come inside. As that problem has bot been resolved, obviously, then the order of the Court was that the door was not to be locked; we issued that order at this time. Open the door, and that safety measure is concluded. So the marshals will be responsible for standing at the door at all times. All right?

MR. FARINACCI:

Your Honor, I have another request.

THE COURT:

Go ahead.

MR. FARINACCI:

There was a small incident yesterday before we finished our day. We are going to ask the Court that as part of the instructions given to the jury, that they be told that

any incident that may take place should not be taken into consideration. That the only thing they are to take into consideration,, that the decisions from the Court are also not indicators that one party is favored over another. So just, Your Honor, because we do not want to make an issue out of this. We believe the incident will not transcend, and we want to be very clear. But we are going to ask that instruction be given, and we are ready for cross-examination.

THE COURT:

All right. I stated in chambers that I would do that; no problem. Bring in the jury.

BAILIFF:

All rise, please.

THE COURT:

Welcome, ladies and gentlemen of the jury. Good morning, everyone.

JURY:

Good morning.

THE COURT:

I would like to ask the defense attorneys and the prosecutors if they agree that the jury is the same and is complete.

MR. FARINACCI:

That's right.

PROSECUTOR:

All right, Your Honor.

THE COURT:

All right. You may be seated. All right. There is a matter to be explained to the ladies and gentlemen of the jury. First of all, Ms. Cecilia Ruiz Solis is going to be a



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

member of the twelve ladies and gentlemen of the jury at this time, because we have excused Mr. Héctor Guadalupe Betancourt from the panel for weighty. Reasons which convinced the Court that he should be excused at this time. Therefore, at this time, we have Ms. Cecilia Ruiz Solis as part of the jury panel. Later on... UNINTELLIGIBLE... Ms. Aida... UNINTELLIGIBLE... as a substitute. And that is the situation. On the other hand, I would like to say, to remind you what I had reminded you during the process, that incidents of arguments about matters of law that may take place should in no way affect the jury in their process of impartiality, because these are only arguments made to the judge, regardless of being made vehemently or not. The Judge's duty to maintain order in the proceeding has nothing to do with the facts of the case and what is being presented. Therefore, the ladies and gentlemen of the jury should not consider that at all. Your obligation is to look at the evidence, examine it, follow the Court's instructions and decide in terms, decide... UNINTELLIGIBLE... As always, the Court will advise that any problem that needs to be resolved should be notified to the Bailiff. Correa or the Bailiff in the Courtroom, Padilla, to resolve it. The Court has issued orders to undertake all efforts necessary to resolve the problem. I would like to ask Ms. Cecilia, how are you health wise?

MS. CECILIA RUIZ SOLIS:

I think I'm fine. Thank you.

THE COURT:

Very well, good. Bring in, the witness is seated... it is now the defense's turn to cross-examine. Go ahead with cross-examination.

MR. FARINACCI:

Good morning.

JURY:

Good morning.

BY MR. FARINACCI:

Q. Good morning, Regino.

A. Good morning.

Q. Good morning. Regino, in answer to questions posed by the prosecutor, you told the ladies and gentlemen of the jury yesterday that you are 25 years old. Is that correct?

A. That is correct.

Q. All right. And you stated that you grew up in Santurce...

THE COURT:

All right. Go ahead, state your name.

A. My name is Regino Burgos Torres.

THE COURT:

All right. Go ahead.

BY MR. FARINACCI:

Q. All right. Mr. Regino, you told the ladies and gentlemen of the jury yesterday that you grew up in Santurce, in the Las Margaritas Public Housing Project.

A. Yes.

Q. That you lived in Canteras, and that you were there for two and a half years.

A. Yes.

Q. You said that, didn't you?

A. Yes.

Q. And that you worked in construction, installing fiber optic cables in telephones. You worked in construction, and you worked installing fiber optic cables for Telefónica.

A. Yes.

Q. All right. And you stated that you did that for about a year and a half, but that you started having a lot of problems at your workplace. I would like for you to repeat for the ladies and gentlemen of the jury what those problems you had at work were.

A. Well, the problems I had at those jobs was that they were behind in their payments, and that sometimes we did not have the materials to work.

Q. All right. I'd like to ask you: In other words, the problem was not yours. It was a problem involving them not paying you.

A. Not paying those of us who worked.

Q. All right. Any, why did they not pay you?

A. Because since it was a private company that worked for Telefónica, the payments were delayed often.

Q. What company was that?

A. No, I don't recall at this time.

Q. You don't recall the name of the company? All right. Make an effort.

A. I don't recall at this time.

Q. You don't recall. And was that your first formal job as an employee of a company?

A. Yes.

Q. All right. I'd like to ask you: You stated that... all right, I will change my question. How old were you at the time you got that first job?

A. About 17 years old.

Q. Seventeen. I'd like to ask you: You stated that you left that job for some reason, for the reason you explained...

A. Um-hmm.

Q. ... and that you then dedicated yourself to a life of crime.



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

A. Yes.

Q. You testified to that, right?

A. Yes.

Q. Were those your words? "I dedicated myself to a life of crime"?

A. Yes.

Q. Was that all of a sudden? How was that, that you suddenly dedicated yourself to a life of crime?

A. Well, in the environment I lived in, I made friends that were not very good and at the place I started.

Q. All right. In other words, my question is: Whom do you blame for dedicating yourself to a life of crime? The friends you chose, or yourself?

A. No, myself.

Q. Yourself. And you told the ladies and gentlemen of the jury that you began your life of crime in drug traffic.

A. Yes.

Q. All right. How did you start, how and when did you start in drug trafficking?

A. Well, I started selling in corners when I was 18, at the drug points when I went to the States.

Q. All right. And what area was that in? When you started, was that in the Las Margaritas area where you lived?

A. Yes.

Q. Okay. And let me ask you: Was it because of the problem you had at Las Margaritas that you went to live in the States?

A. No.



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Q. You never testified to that? That you left to the States because of problems that you had at Las Margaritas, and you went to live with an aunt of yours. Think back.

A. Yes, that's true.

Q. Is that correct?

A. Yes.

Q. Let me ask you: You had those problems at Las Margaritas, you went to your aunt's house, and how long were you there for? Isn't it true you were there for about a month?

A. From a month to two months.

Q. All right. And you caught another drug case there.

A. Yes.

PROSECUTOR:

Your Honor, objection to the phrase "another drug case."

MR. FARINACCI:

That's right, Judge.

THE COURT:

What...

MR. FARINACCI:

Pardon me, Counsel.

THE COURT:

Correct it.

BY MR. FARINACCI:

Q. All right. You caught a drug case over there, which even in answer to questions posed by the prosecutor, you said that it was not that the charges fell through; but rather they let you go because when they filed the case, the police had not; in other words, they either lost or had not taken marked money. Isn't it true you stated that?

A. Yes.

Q. And isn't it correct that when they released you, you made a commitment to the Court over there in the States, that you were going to appear. And instead of appearing, you got on a plane and came to Puerto Rico.

A. Yes.

Q. Isn't it correct?

A. Yes.

Q. What that means is that when you were 18 years old, this first case, you deceived the Court. You agreed that you were going to appear for that case, and instead of appearing, you came back to Puerto Rico.

A. Yes.

Q. All right. What that means is that in that first case you picked up, not only are you saying that you left because of the problem in the States, but you deceived the Court.

THE COURT:

He already answered that question.

PROSECUTOR:

He already answered the question, Counsel.

BY MR. FARINACCI:

Q. Very well. And I'd like to ask you: You came back to Puerto Rico, and you were arrested in the Humacao area because you robbed three women. Is that correct?

A. I robbed, yes.

Q. No women?

A. One man and two women.

Q. One man and two women.



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

A. Yes.

Q. All right. And how long after you had deceived the Court in the States did that happen?

A. That happened in ’89...

Q. How old were you in ’89?

A. In ’89?

Q. Yes. You said that today, in ’96, you are 25. How old were you in ’89?

A. In ’89, I was still 18.

Q. Eighteen.

A. Yes.

Q. Which means that you came back to Puerto Rico and robbed those people in the Humacao area. You committed the crime of robbery.

PROSECUTOR:

That is repetitive. If the area... UNINTELLIGIBLE... he already stated he had committed robbery and the people he...

MR. FARINACCI:

All right.

THE COURT:

Counsel, it is repetitive when you want an answer... all right, go ahead.

BY MR. FARINACCI:

Q. And I’d like to ask you: Were you arrested immediately following that robbery?

A. No.

Q. No? How long after the robbery were you arrested?

A. Days later.

Q. And were you accompanied by other individuals during that robbery?



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

A. Yes.

Q. Including a minor?

A. No, not in the robbery.

Q. No?

A. No.

Q. Didn't a minor participate in the robbery?

A. No.

Q. Who participated?

A. Me and two other men.

Q. All right. But a lady was arrested in that case.

A. She was with me in the vehicle when I left to Humacao.

Q. She was with me; and was she charged?

A. Yes.

Q. All right. And I'd like to ask you: Was she a minor?

A. I don't know if she was a minor.

Q. All right. Give me her name.

PROSECUTOR:

No, we object, if she... UNINTELLIGIBLE... in terms of the issue of criminal proceedings against minors.

MR. FARINACCI:

I understand that privilege cannot stretch that far.

THE COURT:

All right.

MR. FARINACCI:

What I'm asking is the individual's name, if he recalls.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.