occasion. A few minutes ago he was asked that and he answered in the affirmative. In other words, he has said that he is not stupid.

MR. FARINACCI:

All right.

THE COURT:

Proceed, then. Ask the question for the record.

BY MR. FARINACCI:

Q. You are not stupid. Let me ask whether you asked your attorney: "Look, it says 30 years here, but I want to know exactly how much time I am actually going to serve."

A. Yes, I asked her.

Q. How much did she tell you?

A. For the probation, I have to serve about 8 years, and 10 of the 20.

Q. All right. In other words, now we are going down from 30 to 18.

A. It could be. I mean, it is not an exact calculation.

Q. Could it be less?

A. It could be more.

Q. And could it be less?

A. I don't know.

Q. All right. Let me ask you, then. You are 25 years old plus 18 ...

THE COURT:

At this time, um, the Court wants to provide the jury with some information because they could become confused by the situation, since this is a technical matter. Persons serving sentences in Puerto Rico receive certain good-conduct credits granted by the governor through, naturally, [the Department of] Corrections. And those credits are based on good



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

conduct and work. But, of course, one can approximately determine what the minimum would be if the person met all the requirements -- if he met all the work requirements, good-conduct requirements, et cetera. Or the sentence may be reduced under the Regulations as they stand today, so that he would serve a certain amount if he complies with all of them. And then, well, naturally, when a person who is going to enter a guilty plea is advised, it is the attorney's responsibility to inform that person of all those possibilities. But this concerns legislation based on credits for work and good conduct. Proceed.

BY MR. FARINACCI:

Q. Let me ask whether you ... I am going to change the question. Isn't it true that this immunity agreement -- and I will change the question. You were arrested in August of 1995.

PROSECUTOR:

Of '94, Your Honor.

BY MR. FARINACCI:

Q. Of '94.

A. Yes.

Q. All right. Let me ask whether you signed the agreement in August 1994.

A. No.

Q. Did one month, 2 months, 3 months, 4 months, pass? How much time passed before you signed that agreement?

A. How much time afterward?

Q. Yes.

A. One year and 6 months.

Q. All right. Let me ask whether that was less than 2 weeks ago.

A. Yes.

Q. Yes. Which means that the discussion you had with -- 2 weeks ago --



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

less than 2 weeks. Again, I ask you …

PROSECUTOR:

It does not ...

MR. FARINACCI:

... what explanation ... ?

THE COURT:

The thing is ...

PROSECUTOR:

The thing is that he is asking 2 questions. Your Honor, he should allow the witness to answer the first question he asked.

THE COURT:

All right.

MR. FARINACCI:

It was ...

THE COURT:

Counsel, so that we do not continue down this path: you ask him one question. If you wish to ask another, explain to the Court that you are withdrawing the first one, because otherwise it gets to the witness ... he does not know which question to answer. And that confuses all of us.

MR. FARINACCI:

All right.

THE COURT:

Continue. Proceed.

BY MR. FARINACCI:

Q. Let me ask you, witness: how long ago did you sign the immunity agreement that you signed?

A. About two weeks ago.

Q. Two weeks. And let me ask whether, to you, 2 weeks is a long time or a short time.

A. Two weeks?

Q. Yes.

A. A short time.

Q. A short time. And let me ask whether you remember where you discussed with your attorney the details of the plea agreement, of the agreement.

A. Of the agreement?

Q. Yes. No. Do you remember where you discussed those details with her?

A. Here in Court.

Q. Here in Court. Let me ask whether she sat down with you and went through that agreement page by page to explain it to you.

A. No.

Q. No?

A. No.

Q. Are you saying that your attorney did not explain that agreement to you page by page?

A. No.

Q. No? Let me ask, then: how was it explained? Was it in general terms, or was she not even present when the agreement was signed, or how did that happen?

A. Under the circumstances I was in, no.

Q. No what?

A. She was not there.

Q. In other words, that agreement was signed without your attorney being present. Is that what



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

you are telling the Court?

A. With her advice.

Q. All right. But was she present or not?

A. No.

Q. Which means that you signed it without her saying to you, “Regino, sign here,” and without you asking her, “How much time am I going to serve?” In other words, you did not have that opportunity when you signed it?

A. No.

Q. Addressing the ladies and gentlemen of the jury, I want you to tell the ladies and gentlemen of the jury whether you were interested in knowing how much time you were going to serve. Were you interested or were you not interested?

A. Uh, actually, yes.

Q. All right. What prevented you from saying, “No, I want my attorney to come here and tell me how much time I am going to serve ...”?

A. You know ...

Q. Was there anything preventing you from doing that?

THE COURT:

Allow him to answer you.

A. Because of the 30 years that had already been stipulated in this thing, well, you know, I accepted what -- what I had. That's why I didn't -- and I had already spoken with her about that, about the sentence and the agreements. I already knew about them.

BY MR. FARINACCI:

Q. Regino, my question is, addressing the ladies and gentlemen of the jury ...

A. Yes.

Q. ... whether you were not interested in knowing ...

THE COURT:

Uh...

PROSECUTOR:

For the record, Your Honor, he already answered ...

THE COURT:

He already answered that he was interested.

BY MR. FARINACCI:

Q. All right. And let me ask why, if anything, you did not call her and say, "Explain to me how much time I am going to serve."

A. Yes.

Q. And she came and explained ...

THE COURT:

No, no, no. The answer to that, why, if anything, you did not call her to have her explain it to you. That is the question.

A. I had spoken with her several times about the same thing, the agreement, and I already knew ...

THE COURT:

Proceed, Counsel.

BY MR. FARINACCI:

Q. All right. And to finish with that line, how much did she tell you that you were going to serve?

A. How much?

Q. Yes.

A. She did not give me an exact figure because she does not know what the [Department of] Corrections tables are. She did not give me an exact figure.

Q. Just so we are clear: the attorney who negotiated this agreement for you did not give you that

information because she did not have the [Department of] Corrections tables.

A. In other words, she does not know exactly how the credits work.

Q. And let me ask whether you told her, “Then find them,” whether you told her, “Look, if they are at Corrections, then call Corrections and have them fax them over.”

A. Now, they looked up the previous ones for me, but ...

Q. And they are going to look them up for you, except that now, while you are testifying, they still have not looked them up for you.

A. Yes, she is going to look them up for me.

Q. All right. Let me ask the witness whether yesterday you testified that the firearm that you say Mr. Crespo Morales gave to you -- to Miguel was a 9-millimeter firearm.

A. Yes.

Q. Nickel-plated.

A. Chrome-plated and gray.

Q. All right. Was it black?

A. The grips.

Q. No, I am asking whether the firearm was black.

A. No.

Q. Nickel-plated.

A. Yes. The bottom portion.

Q. All right. And let me ask whether the difference -- generally, based on your knowledge of firearms, firearms are basically black or nickel-plated.

A. Different.

Q. Exactly, but those are more or less all that there is: black and nickel-plated.



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

THE COURT:

The Court understands that the answer does not answer the question. What do you mean by "different"?

A. There are black firearms, and there are nickel-plated firearms with 2 color tones.

BY MR. FARINACCI:

Q. All right.

A. Metallic.

Q. All right. But this one that, according to you, was handed over -- the one you allege was handed to Miguel was nickel-plated. Isn't that right?

A. Not nickel, nickel as such ...

Q. But was it nickel-plated or was it black?

PROSECUTOR:

Your Honor, well, he should be allowed to answer, Your Honor.

THE COURT:

Counsel, if you ask him a question, allow him to answer it.

BY MR. FARINACCI:

Q. Excuse me.

THE COURT:

What did that firearm look like?

A. The firearm was, well, a metallic gray.

BY MR. FARINACCI:

Q. Metallic gray.

A. And the bottom is metallic, sort of -- sort of a silver color, not shiny.

Q. All right. Let me ask whether you testified while -- in response to the Prosecutor's questions, that when they arrived at the little house, Miguel was the first person to enter.

A. Yes.

Q. All right. Which means that, if what you say is true that Crespo gave that firearm to Miguel, the first firearm to enter was nickel-plated ...

A. Yes.

Q. ... it was not black.

A. Nickel-plated.

Q. Let me ask whether, during the course of the events, you saw a young woman named ... Mercedes.

A. When I went in?

Q. Yes. Mercedes.

A. When I went in, I did not see her.

Q. All right. But you knew she was there.

A. Yes.

Q. All right. That woman was there.

A. Yes.

Q. Yes. If Mercedes says that the person who entered first ...

PROSECUTOR:

... ININTELLIGIBLE ... testified, Your Honor ...

THE COURT:

Objection sustained.

PROSECUTOR:

... ININTELLIGIBLE ... Counsel's argument.

THE COURT:

Objection sustained.

BY MR. FARINACCI:



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Q. Let me ask you, witness: yesterday you spoke about a horse.
A. Yes.
Q. Let me ask whether you stated that the joke at Mr. Crespo's alleged house concerned Ronald having shot a horse.
A. Yes.
Q. Let me ask whether that night -- yesterday you testified you saw that horse there.
A. Yes. I saw it.
Q. You saw it. And let me ask whether that horse was white.
A. No.
Q. Was it white?
A. No.
Q. And let me ask whether, with respect to that horse, Ronald stated that he had shot it and that the horse had fallen there.
A. No.
Q. Let me ask whether you or Ronald ever told Prosecutor Castro that the white horse ...

PROSECUTOR:

We object. Counsel is suggesting that the Prosecution has spoken with several of the defendants in this case. He is making ...

MR. FARINACCI:

In theory ...

PROSECUTOR:

... that is what he is saying through the question.

THE COURT:

All right. Uh, what -- your side speaks.



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.