MR. FARINACCI:

All right. As part of the theory, the Prosecutor said: "We are going to prove to you that a white horse fell there and fell right there."

PROSECUTOR:

We never said that ...

MR. FARINACCI:

I have the recording and the ... ININTELLIGIBLE ... stated it.

PROSECUTOR:

... Your Honor, we never stated that.

MR. FARINACCI:

I have the recording.

PROSECUTOR:

We never stated that.

THE COURT:

All right.

MR. FARINACCI:

Let the recording be located.

THE COURT:

All right. Counsel, that is not necessary. Proceed with the question.

BY MR. FARINACCI:

Q. Let me ask whether you stand by your statement that you saw a horse there.

A. Yes.

Q. You were not hallucinating?

PROSECUTOR:

Your Honor, we object, Your Honor. That is ...



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

THE COURT:

... ININTELLIGIBLE ... with that type of questioning. These proceedings have been conducted in a very professional manner.

BY MR. FARINACCI:

Q. Witness, you stated to the ladies and gentlemen of the jury that when you arrived there that night with several people, according to you, you all traveled in a single vehicle.

A. Yes.

Q. All right. Not in several vehicles.

A. No.

Q. And let me ask whether you -- your version is that you left that vehicle farther ahead, behind some trees.

A. Yes.

Q. All right. Which means that you -- according to your version, you traveled there in only one vehicle.

A. Yes.

Q. Not several?

A. No. One.

Q. Let me ask you, witness. You stated to the ladies and gentlemen of the jury that Miguel knocked down the door, kicked the door, you followed him, and Rey came after you. Is that the order in which you entered?

A. Yes.

Q. All right. Let me ask whether you stated yesterday that when you were about to fire the gun, you did not fire because it had slipped out a little, the ... what do you call it? The ...

PROSECUTOR:



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

The magazine.

BY MR. FARINACCI:

Q. The magazine.

A. Yes.

Q. All right. You testified that you became enraged, isn't that right?

A. Yes.

Q. What did you mean when you said you became enraged? Were you so eager to kill? Why did you become enraged?

A. Why? Because I knew they had guns in there.

Q. Is that the reason you give for becoming enraged?

A. Yes. That was a mistake, and it could have cost me my life.

Q. All right. And you went out, immediately put the magazine in, and let me ask whether you testified here that you went in with 14 rounds and used all of them.

A. Yes.

Q. You ran out of ammunition.

Q. All right. You testified to the ladies and gentlemen of the jury that the reason the women were not killed was because you said they should not be killed. Let me ask whether the real reason you did not kill the women was precisely because ... because you ... Look at what you told us yesterday ...

PROSECUTOR:

We object ...

THE COURT:

... ININTELLIGIBLE ...

BY MR. FARINACCI:

Q. All right. Let me see where I continue with this line, because the reality is that when you



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

went back inside, you realized that you had run out of ammunition.

THE COURT:

Answer.

A. No.

BY MR. FARINACCI:

Q. No?

A. No.

Q. And let me ask whether you testified yesterday that when you went back inside, before entering you said: “I think someone is still alive,” isn't that right?

A. Yes.

Q. Then why did you go back inside? To see -- to render first aid?

A. No. To see.

Q. To kill him ...

THE COURT:

Let him answer, Counsel. Go ahead.

A. I was looking for the men, yes.

BY MR. FARINACCI:

Q. All right. Let me ask you, witness. While looking at the ladies and gentlemen of the jury ...

A. Uh-huh.

Q. ... let me ask whether yesterday you told the ladies and gentlemen of the jury that Ronald had remained by an area where there was a door, and that the reason you said that was because he had been instructed to stay there in case someone came running out that way.

A. Yes.

Q. All right. And did it not occur to you -- and what were Ronald's instructions?

A. That if someone came out through that door ...



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Q. To take him down?

A. Yes.

Q. All right. And what if the girls came running out? And you -- how were you going to prevent them from being killed?

A. I don't know.

Q. Witness, isn't the truth that you were not going to leave anyone alive there because they had tried to kill your wife?

THE COURT:

Answer.

A. If I had wanted that no one ...

MR. FARINACCI:

You may answer ...

PROSECUTOR:

Allow him to answer it. He asked him an open-ended question, Your Honor.

MR. FARINACCI:

It is not responsive.

PROSECUTOR:

Let him answer.

THE COURT:

It is definitely responsive. Answer.

A. If I had wanted no one to come out of there alive, the 2 girls would have died.

BY MR. FARINACCI:

Q. All right. Let me ask whether the reality is that you did not kill them, first, because one of them was pinned beneath the body of one of the persons you had killed and you

thought she was dead.

A. No.

Q. No?

A. No.

Q. And let me ask whether the other woman was not killed because you opened the bathroom door and did not see her because she was lying in the bathroom, concealed by the shower curtain.

A. I never actually opened the door.

Q. But were you looking in there?

A. I only touched the lock, nothing more, and I did not go in.

Q. All right. Let me ask you, witness, to finish with that line: if you did not end up killing the women, what measures did you tell Ronald to take so that, if someone came running out the back, he would not kill the women?

A. I only told him that whoever came out that way, he should kill them, shoot at them.

Q. All right. And let me ask whether you -- your testimony is that you knew there were 3 women inside that house.

A. Yes.

Q. All right. And let me ask whether you stated yesterday that at around 2:00 in the afternoon -- whether you said this, that at 2:00 in the afternoon you went by there and noticed that there were women, heard the women's voices, and said: “Those are the women of the men we are looking for.”

A. Yes.

Q. All right. And let me ask whether you are certain that at 2:00 in the afternoon on the 3rd, all 3 women were there.

A. No, I am not sure whether all 3 were there.

Q. In other words, in your sworn statement, let me ask whether you testified that



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

you heard the sound of several women, as if they were playing around.

A. Yes.

Q. All right. Witness, let me ask you ... let me ask you, witness. Ronald's instructions to kill the persons who came out through that door were so clear that what you have told the ladies and gentlemen of the jury is that a horse came out that way and he shot at it.

PROSECUTOR:

Counsel is answering his own question, Your Honor.

THE COURT:

Witness, do not answer that question. Proceed, Counsel.

BY MR. FARINACCI:

Q. Where did the horse come from?

A. It was in the surrounding area.

Q. In the surrounding area. All right. And let me ask you, Mr. Witness, whether you -- during the investigation of this case, what location, if any, did you leave -- go -- accompany the investigating agent to?

A. None.

Q. Which means that you, during the investigation of this case, you -- the investigating agents did not take you anywhere so that you could say, “That is the house, this is it,” but instead they brought photographs to you.

A. I provided information.

Q. Uh-huh. My question is, then, that you never went with them to any location, isn't that what you answered?

A. Yes.

Q. All right. And let me ask you the name of the cockfighting arena where you allege this gentleman went with you to look for the people, where you confused one vehicle for another and it later turned out to be different people.



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

A. The name of the cockfighting arena?

Q. Yes.

A. I don't know it.

Q. Let me ask whether any investigating agent told you: “Well, since you don't know the name, come on, get in the car with me, let's go. Let's go over there. You know how to get there. And we'll go see that cockfighting arena.” Didn't anyone do that?

A. No.

Q. No? And let me ask whether any investigating agent told you, “Well, since you say Crespo's son gave you the ammunition in front of the house of one of his aunts or sisters” -- whether you went with the investigating agent and told him, “This is the house where they gave me the ammunition.”

A. No.

PROSECUTOR:

Your Honor, we object. Your Honor, the witness has already told him that he did not undertake any action with any of the investigating agents in the case.

THE COURT:

So determined.

PROSECUTOR:

All right.

BY MR. FARINACCI:

Q. And the Prosecutor has not shown you photographs of that alleged house either?

A. No.

Q. Let me ask you, witness: do you remember the time ... ? I am going to change the question. How many times did you speak with your attorney before giving the sworn statement you gave during the investigation of this case?

A. How many times?



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Q. Yes.

A. About 3 or 4 times.

Q. Three or 4. But the fact is ... let's see whether this is the chronology of events. You were arrested in August of '94, isn't that right?

A. Yes.

Q. The sworn statement that you gave regarding these events, did you give it soon afterward, or did a considerable amount of time pass?

A. About 7 months.

Q. Seven months later. Seven months. The Prosecutor who took your sworn statement, how many times had you spoken with him?

A. How many times?

Q. Before the day you gave the statement. Whether you had spoken with him before, or whether they simply brought you in and you said, "I have already consulted with my attorney ..."

A. I saw him in the courtroom.

Q. Yes, but my question is very simple. Look.

A. Uh-huh.

Q. You gave the sworn statement.

A. Yes.

Q. Do you want to know the date on which you gave it? I am going to request that it be handed to you again. Tell the ladies and gentlemen of the jury with certainty the date on which you gave it.

A. April 10, '95.

Q. At what time? On the last page. See whether there is a time written there.

A. At 2:15 p.m.

Q. All right. April 10, '95 ...

A. At 2:15 p.m.



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Q. Let me ask whether you were present when the case was submitted to a judge.

A. When the case ... ?

Q. When it was brought before a judge.

A. When I gave the statement?

Q. Yes. You gave your statement. Let me ask whether they took you before a judge so that you could say: "Judge, under oath, I state that what happened was this, this, this, and this."

A. No.

Q. You did not appear before a judge?

A. No.

Q. In other words, do you know how probable cause was determined in this case? How was Mr. Crespo's arrest ordered? In other words, how, without you being present to speak with a judge ... ?

PROSECUTOR:

We object. Counsel is mistaken ...

MR. FARINACCI:

No, no, Judge ...

PROSECUTOR:

Of course he is, Your Honor.

THE COURT:

Approach the bench.

**... SIDEBAR CONFERENCE ...**

THE COURT:

What kind of ... ?

PROSECUTOR:

The thing is ...



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.